Jeffrey L. HEIDEMAN,
Plaintiff–Appellant,

v.

Wayne WIRSING and Price County,
Wisconsin, Defendants–
Appellees.

No. 92–3873.

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1993.

Decided Oct. 18, 1993.

**660**

P. Scott Hassett, John Christopher Talis, Lawton & Cates, Madison, WI, for plaintiff-appellant.

John P. Runde, Cassandra B. Westgate, Terwilliger, Wakeen & Piehler, Wausau, WI, for defendants-appellees.

Before FLAUM and RIPPLE, Circuit Judges, and WILL, Senior District Judge.[*]

FLAUM, Circuit Judge.

1990 was an election year for sheriff of Price County in Wisconsin. Wayne Wirsing, who had served as Price County sheriff since 1986, was running against deputy sheriff Richard Heitkamper. Jeffrey Heideman, a deputy who joined the department on January 8, 1990, was backing Heitkamper. According to Heideman, he and others within the department were open in their support of the challenger Heitkamper. In fact, between May of 1990 and the election in November, Heideman spent off-hours making and repairing campaign signs, attending campaign meetings, and advertising his support on the off-duty clothing he wore.

During the evening of November 5 and the early hours of November 6, 1990, Heideman, while off-duty, joined a friend at a tavern in Phillips, Wisconsin. With the big election only a day away, the talk naturally turned to politics. Heideman got into a heated discussion with the bartender, a Wirsing man. Apparently, the bartender was denigrating the sheriff's department and even said "if you want to drive drunk in Price County[,] keep Wirsing here because he's the type of man we need. He doesn't enforce the laws here in Price County." An exchange of obscenities followed the bartender's gibe. And although Heideman asked the bartender to step outside, the deputy regained his composure before anyone resorted to fisticuffs. After paying his bill, Heideman and his friend left. Subsequently, Phillips Police Chief Craig Moore investigated the dispute between Heideman and the bartender. Having instituted a fairly stringent policy on public disorders after long experience with barroom brawls in Phillips, Moore issued a standard citation to Heideman for disturbing the peace.[1]

---

[*] The Honorable Hubert L. Will of the Northern District of Illinois, sitting by designation.

1. Moore also placed a reprimand in the file of Heideman, who worked in the Phillips Police Department on a part-time basis.

Wirsing triumphed in the election on November 6. The following day he suspended Heideman with pay pending an investigation of his altercation with the bartender.[2] Chief Deputy Timothy Gould oversaw the investigation of Heideman's conduct at the tavern; and on November 9, he presented the results to the Price County Law Enforcement Committee. The Law Enforcement Committee of the Price County Board makes recommendations to the Personnel Committee regarding employment-related matters in the Sheriff's Department. The Personnel Committee makes all of Price County's employment decisions. Wirsing, a member of the Law Enforcement Committee, was present at this meeting but did not vote on the motion to recommend termination of Heideman. The motion passed.

On November 10, a private investigator retained by Price County to examine this incident issued a report to the corporation counsel of the County. In its meeting on November 12, the Price County Personnel Committee convened to discuss Heideman's fate, accepted the recommendation of the Law Enforcement Committee, and terminated Heideman. At the time of his termination, Heideman was still a probationary deputy sheriff. The deputy sheriffs of the county are members of a local collective bargaining unit, the Price County Deputies Association. According to the collective bargaining agreement, deputies can be disciplined or discharged for just cause. However, a new deputy must serve for one year as a probationary employee, during which time the deputy is considered an at-will employee.

Heideman brought suit against Wirsing and Price County under 42 U.S.C. § 1983 for a violation of his First Amendment and due process rights and under 42 U.S.C. § 1985 for conspiracy to violate his civil rights as well as several related state-law claims. The defendants moved for summary judgment. After reviewing the evidence, the magistrate judge recommended that summary judgment be granted in favor of all defendants on the First Amendment claims and to Wirsing with

respect to the due process claim. In addition, the magistrate judge concluded that dismissal would be appropriate on the conspiracy count because of a failure to state a claim. Subsequently, the district court adopted the magistrate judge's factual findings and legal conclusions. 1992 WL 547765. Heideman has appealed only the decision to grant the defendants summary judgment on his First Amendment claim.

## I.

Heideman contends initially that his heated barroom argument, while in the throes of a political campaign, constituted speech. We will assume this characterization to be true for purposes of our summary judgment analysis. The fundamental principle underlying this and similar cases is that a state "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). Under this general principle, a public employee may not be discharged for the expression of any ideas on any "matter of legitimate public concern." *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). However, this protection is not absolute inasmuch as the state "has interests as an employer in regulating speech that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568, 88 S.Ct. at 1734. Accordingly, the goal is to strike a balance between the interests of public employees in political expression with the efficiency concerns of the state as a provider of public services.

For purposes of accommodating these potentially conflicting demands between responsive government and the First Amendment rights of public employees, the Supreme Court has developed two varying methods for analyzing whether political expression may be the basis for the discharge

---

**2.** In addition to being suspended, Heideman was banned from the building that housed the sheriff's department. Heideman could no longer work for Chief Moore inasmuch as the Police Department was located in that same building. However, Heideman has not raised this matter in the present appeal.

of a public employee. Although this distinction is frequently treated as one between political patronage and employee speech (or, alternatively, political affiliation and political expression), the line is not so stark. Patronage may be most appropriately characterized as a particular subset of the wider category of discharges based on the First Amendment. Accordingly, the analysis utilized depends on the manner in which the exercise of an employee's First Amendment rights may impede the effective functioning of the public office in question. In *Pickering*, for example, the Court held that a teacher could not be terminated for criticizing the local board of education. At stake was expression that arguably posed a direct threat to the integrity of employer-employee relations. *Compare Biggs v. Village of Dupo*, 892 F.2d 1298, 1303–04 (7th Cir.1990) (discharge of part-time police officer after critical interview appeared in local paper unlawful because interview caused no disruption in police work) *with Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1258–59 (7th Cir.1985) (discharge of county administrator of Comprehensive Employment and Training Act for complaint telegrammed to U.S. Department of Labor lawful since telegram was "disruptive of employment relationship"). Moreover, as the *Pickering* Court noted with respect to the teacher and the board, the relationship did not involve "the kind of close working relationship for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering*, 391 U.S. at 570; 88 S.Ct. at 1735.

 It follows that expressive or associational activities would not be decisive in filling or depleting the ranks of lower government positions. *See Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (automatic replacement of non-civil service employees with members of own party by Cook County Sheriff unconstitutional); *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980) (firing assistant public

defenders affiliated with different political party from newly appointed Public Defender unconstitutional); *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (discharge of clerical worker in county constable's office for comments hostile to President unconstitutional). On the other hand, the reasons for allowing ideological criteria to determine tenure for positions involving a higher degree of policy significance are sufficiently compelling to withstand First Amendment attack. *See Elrod*, 427 U.S. at 367–68; 96 S.Ct. at 2686–87 (establishing patronage exception for policymaking and confidential positions); *Terry v. Cook*, 866 F.2d 373, 375 (11th Cir.1989); *Meeks v. Grimes*, 779 F.2d 417, 419 (7th Cir.1985); *cf. Soderbeck v. Burnett County*, 752 F.2d 285, 288 (7th Cir.), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985). Both *Elrod* and *Branti* embrace the notion that retaliation in response to political beliefs and political associations, which are typically manifested in the electoral process, may be warranted if the free expression poses a threat to the efficient conduct of a public office because the employees' position requires political loyalty. Because the individual and governmental interests are essentially unvarying in patronage cases, the focus is less on the expressive activity than on the office occupied by the person engaging in that activity. Accordingly, patronage-based dismissals (or most any other employment decision after *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)) are limited to persons holding policymaking positions. Viewed in this context, Heideman's discharge is more appropriately analyzed as an incidence of political patronage.[3]

## II.

 To assess the validity of political considerations in filling policymaking positions, the Supreme Court has adopted a functional analysis, in which the relevant inquiry is "whether the hiring authority can demon-

---

**3.** In any event, were we to analyze this case according to *Pickering*, Heideman would not prevail because he has not cleared the second hurdle of its test, namely that his interest in expression

outweighs Price County's in the efficient operation of the sheriff's department. *See Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35.

strate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295. This court has elaborated the relevant inquiry in broad terms. "The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *accord Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). Those vested with significant discretionary authority, as opposed to ministerial duties, are easily identified. *See, e.g., Livas v. Petka*, 711 F.2d 798, 800–01 (7th Cir.1983) (public prosecutors). Many of the patronage exemptions affirmed by this court, however, have focused on the various elements of implementation—the actual provision of public services. *See, e.g., Heck v. City of Freeport*, 985 F.2d 305 (7th Cir.1993) (sanitation); *Upton v. Thompson*, 930 F.2d 1209, 1214–15 (7th Cir.) (sheriff), *reh'g en banc denied sub nom. Thulen v. Bausman*, 938 F.2d 84 (7th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992); *Bicanic v. McDermott*, 867 F.2d 391, 393 (7th Cir.1989) (parks); *Tomczak*, 765 F.2d at 642 (water department). Those responsible for providing services are exempt from the general prohibition against patronage dismissals since the primary function of local government is the provision of these services. Of course, politics may affect the implementation of policy at any level of public service. A disgruntled Republican clerk who works in some Democratically controlled organization may dilly-dally in fulfilling his responsibilities. Defining the patronage exemption to include anybody participating in implementation would thus expose virtually any employee in any size organization to a patronage-based discharge. Consequently, the inquiry focuses on whether a public employee has "meaningful input" into either making decisions or implementing them.

■ Addressing circumstances quite similar to the present case, this court in *Upton v. Thompson* sought to answer this question with respect to two deputy sheriffs employed by different Illinois counties. 930 F.2d at 1216–18. Upton had been a member of the Kankakee County sheriff's department, which employed approximately 70 deputies; Thulen had served in Carroll County in an office consisting of four deputies. Assuming that actively campaigning against the winning sheriff is sufficient to manifest political affiliation, *Upton* analyzed whether such affiliation is an appropriate requirement for the effective performance of a deputy sheriff.[4] Analogizing from *Livas*, which held as a matter of law that political considerations were an appropriate employment criterion for assistant state prosecutors, the *Upton* court concluded that these same considerations would be appropriate for determining whether deputies could continue to serve their departments. 930 F.2d at 1217–18.

Despite the sweep of the literal language of *Upton*, its actual impact may be quite limited. Deputies are often protected from summary dismissals by collective bargaining agreements or by statute. *See, e.g.*, Wis. Stat. 59.21(8)(b)(1); *see also* Ind.Code § 36–8–10–11. For example, Heitkamper, a deputy of long standing in Price County protected by the local collective bargaining agreement, retained his post as a deputy sheriff after his unsuccessful challenge to Wirsing. Since politicking is not just cause for discharge, only probationary deputies, who are treated as at-will employees, are subject to dismissal under these circumstances.[5] As a consequence, any constitutional lines we may at-

---

**4.** The fact that *Upton* as well as this case involve the support of an individual candidate rather than party affiliation more broadly is of no consequence. In many counties, there is no real two-party system in local election contests. Competing candidates typically represent factions that owe only nominal allegiance to a political party. Voting is driven by factional rather than party adherence, as well as by the personalities of those competing for office.

**5.** In fact, a panel of this court has reasoned that a probationary deputy can be discharged for *not* politicking. *See Dimmig v. Wahl*, 983 F.2d 86 (7th Cir.1993).

tempt to draw apply, in practice, only to deputies like Heideman, who are on probationary status or are otherwise unprotected. Nevertheless, the fact that deputies may reap the benefits of state or local protection does not undermine the validity of the patronage analysis. And the rule adopted in *Upton* controls here. *See Upton,* 930 F.2d at 1218.

In reaching this conclusion, the *Upton* court suggested initially that the voting public would perceive a deputy who opposed the victorious sheriff to be hostile and unreliable. In view of the protection afforded full deputies in Price County, the perceptions of the voting public may not be pertinent. If patronage-based employment decisions turn on the reliability of the deputy, performance is a more relevant criterion. In this regard, the need for mutual trust and confidence, particularly in smaller departments, supports the conclusion that political conclusions do matter. As deposition testimony from the present case demonstrates, members of the Price County Law Enforcement Committee and the Personnel Committee were concerned about Heideman's ability to function consistently and competently as a member of the sheriff's department collective. Moquin Dep. at 8, 11–12; Lukes Dep. at 17, 26–27; Heuckman Dep. at 13; Nussberger Dep. at 21; Helixon Dep. at 16, 19. Heideman's aggressive partisanship at the tavern suggested that his presence in the sheriff's department would not foster the necessary cooperation among the approximately fifteen deputies, the Chief Deputy, and the Sheriff of Price County. Admittedly, Heideman's situation differs from that in *Upton* inasmuch as Price County has adopted a specific policy allowing sheriff's deputies to engage in political campaigns as long as their participation does not interfere with the performance of their duties. However, the reach of *Upton* is broad: "[A] sheriff may use political considerations when determining who will serve as a deputy sheriff." *Upton,* 930 F.2d at 1218. Consequently, Heideman cannot prevail on his First Amendment challenge to his discharge.

AFFIRMED.

RIPPLE, *Circuit Judge,* concurring in the judgment.

I agree that the judgment of the district court ought to be affirmed. I cannot agree, however, that this result ought to be grounded in this circuit's political patronage cases. Rather, I believe that the appropriate course is to affirm the judgment on the basis of the Supreme Court's decisions in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

As the panel majority points out, despite this court's decision in *Upton v. Thompson,* 930 F.2d 1209 (7th Cir.1991), *reh'g en banc denied,* 938 F.2d 84 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992), many communities in this Nation have recognized that politics and police work not only need not go hand in hand but ought not go hand in hand. As the panel majority also points out, this value judgment has, in many instances, been reflected in the law of the jurisdiction. In other instances, a nonpolitical police force may simply be a matter of custom and practice, still strong factors in local governance. On the record before us, there is, at the very minimum, a genuine issue of controverted fact as to whether Mr. Heideman was discharged because of either his political affiliation or his political activities. Indeed, the record reflects that he had engaged in those activities for quite a while without becoming the object of any adverse employment action. It is entirely possible that, in a state that protects most of its police officers from political retribution, local traditions of governance would render such action unlikely even though not protected by the statute. Therefore, even though under the present caselaw in this circuit it might have been possible to discharge Mr. Heideman for political activity, we can hardly assume, in assessing the correctness of a summary judgment, that such politically-based action took place. If, as well may have been the case, no such action was taken, we can hardly justify the action that was taken on that ground.

The record does show, however, that Mr. Heideman was discharged because his dis-

course on a matter of public interest degenerated into a disturbance of the peace for which he received, as my colleagues point out, a standard citation. While the content of most of Mr. Heideman's speech may have been protected by the First Amendment, the governmental interest in discouraging bar room brawls by those sworn to protect the peace certainly outweighs that protection. *See Connick,* 461 U.S. at 142, 103 S.Ct. at 1687; *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. The police department is not obligated constitutionally to retain an officer who engages in the sort of activity that the community expects the police to check.

Accordingly, I would affirm the judgment of the district court on this alternate basis because I believe that it is the ground supported by the record.