**Albert R. McEVOY, Plaintiff–Appellee,**

v.

**John SPENCER, individually and as Mayor of the City of Yonkers; Donald Christopher, individually and as Commissioner of Police of the City of Yonkers, Defendants–Appellants.**

**No. 1306, Docket 96–9333.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1997.

Decided Aug. 11, 1997.

[Page content redacted]

Elisabeth A. Palladino, Deputy Corporation Counsel, Yonkers, NY (Philip A. Zisman, Corporation Counsel, Yonkers, NY, on the brief), for defendants-appellants.

Craig T. Dickinson, Lovett & Gould, White Plains, NY, for plaintiff-appellee.

Before: NEWMAN, McLAUGHLIN, and CUDAHY,* Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal presents several issues concerning a public employer's right to take adverse action against an employee for exercising his First Amendment speech and his First Amendment associational rights. The issues arise at the intersection of the doctrines set forth in two Supreme Court decisions, *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In brief, *Pickering* accorded public employees some protection from adverse action taken because of their speech, while *Elrod* gave them some

* The Honorable Richard D. Cudahy of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

protection if they were discharged because of their political affiliation, unless they occupied "policymaking" positions. This appeal raises questions regarding (1) the nature of the distinction between the *Pickering* and the *Elrod* lines of Supreme Court decisions, (2) the proper method of analysis to be used when a public employer's adverse actions against an employee are motivated both by speech protected by *Pickering* and by political considerations that left the employee vulnerable under *Elrod,* and (3) the effect of an employee's policymaking status in the *Pickering* balancing test.

These issues arise on an appeal by defendants John Spencer and Donald Christopher from the September 12, 1996, order of the District Court for the Southern District of New York (Jed S. Rakoff, Judge), denying the defendants' motion to dismiss the complaint of plaintiff Albert McEvoy on the ground of, among other things, qualified immunity. We conclude (1) that employment action taken because of both speech protected under *Pickering* and political association unprotected under *Elrod* creates no liability and (2) that where employment action is taken solely because of speech, the employee's policymaking role weighs in favor of the employer in the *Pickering* balance, but does not provide automatic insulation from liability. Since the first ruling precludes all liability for plaintiff's first demotion, we dismiss the claim concerning that action, at least insofar as it concerns appellants Spencer and Christopher. Since the second ruling settles a point of law that was unsettled at the time of plaintiff's second demotion, we uphold defendants' claim of qualified immunity as to the second demotion and remand for further proceedings with respect to that action.

Background

Because the defendants' claim to qualified immunity was presented in a Rule 12(b)(6) motion to dismiss, we accept as true all material facts alleged in the plaintiff's complaint and draw all reasonable inferences in his favor. *See Hill v. City of New York,* 45 F.3d 653, 657 (2d Cir.1995). The essential factual allegations, set forth in the plaintiff's supplemental complaint, are as follows.

In the Spring of 1995, McEvoy was appointed Police Commissioner of Yonkers by former Yonkers Mayor Terence Zaleski. McEvoy's appointment was subsequently approved by the Yonkers City Council.

After taking office as Police Commissioner, McEvoy "publicly and in-house" expressed his opinion that the prior Commissioner had permitted excessive and unnecessary overtime payments to police officers, that the police department had been grossly mismanaged, and that sworn members of the department, with the help of their union, defendant Police Benevolent Association of the City of Yonkers ("the Union"), had abused their control over police deployment and other important employment issues. McEvoy thereafter instituted substantial reforms in the administration of the police department. He cut overtime expenditures, enforced disciplinary rules, and attempted generally to regain control over the department from the Union and its members.

In response to McEvoy's criticisms and initiatives, Union membership commenced an orchestrated work slowdown, which reduced police protection in the City of Yonkers. McEvoy publicly decried this action as unlawful, and instituted a proceeding before the New York State Public Employment Relations Board ("PERB") to petition for redress against the striking officers and the Union. This action further aroused the rank and file of the department against McEvoy.

As these events were unfolding, defendant Spencer, then a member of the City Council, began campaigning for election as mayor of Yonkers against the incumbent Zaleski. With a view toward removing McEvoy from the office of the Commissioner, the Union and certain of its members approached candidate Spencer, who needed Union support, and "struck a deal" with him. Under the terms of this agreement, the Union would publicly endorse Spencer and offer him financial support in exchange for Spencer's promise, upon his election, to remove McEvoy from the Commissionership and replace him with defendant Christopher, preferred by the Union. Spencer agreed to this arrangement despite the fact that he had previously written to McEvoy to advise him that

he would continue as Commissioner until the year 2000 if Spencer was elected mayor.

With the Union's assistance, Spencer won the mayoral election in November 1995. Shortly after he was sworn into office in January 1996, Spencer replaced McEvoy with Christopher and demoted McEvoy to the position of Deputy Chief.

In April 1996, McEvoy filed the present section 1983 suit against Spencer, Christopher, the Union, and the City of Yonkers, alleging that their conspiracy to demote him to Deputy Chief violated his First Amendment rights to free speech and to petition government for redress of grievances. The original complaint alleged, for instance, that Spencer "was aware of Plaintiff's said opinions ... [and intended to] punish[ ] Plaintiff for having advocated reform" in the police department by removing him as Commissioner. The complaint sought compensatory and punitive damages as well as the removal of Christopher and the reinstatement of McEvoy to the Commissionership.

As a proximate result of McEvoy's filing of the original complaint, defendants Spencer and Christopher entered into another agreement in which they determined to retaliate against McEvoy for suing them. Five days after the suit was filed, Christopher summoned McEvoy to his office and informed him that he was being further demoted to the rank of Captain because of the institution of the present suit. Christopher also ordered McEvoy to assume command, upon his demotion, of one of the most crime-ridden precincts in Yonkers.

The next day, McEvoy filed a supplemental complaint, adding a new claim that Spencer and Christopher violated his rights to free speech and to petition government for redress of grievances by demoting and reassigning him in retaliation for filing the initial complaint. In May 1996, all of the defendants moved to dismiss the complaint on several grounds, including qualified immunity for defendants Spencer and Christopher. The District Court denied the motion in its entirety and ruled, regarding the qualified immunity issue, that this defense was unavailable because the pertinent contours of the protections afforded by the First Amendment were sufficiently clear at the time of the complained-of employment decisions for a reasonable official to recognize that these actions violated McEvoy's constitutional rights.

## Discussion

### I. Issues on Appeal and Pendent Jurisdiction

"An order denying a motion to dismiss on the ground of qualified immunity is immediately appealable where the district court has rejected that defense as a matter of law." *Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995); *see Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985). We therefore have jurisdiction to review the District Court's ruling that, because the applicable law was clearly established at the time of McEvoy's two demotions, Spencer and Christopher are not entitled to qualified immunity.

The immunity question turns on whether it was objectively reasonable for Spencer and Christopher to believe that their decisions to demote McEvoy did not violate his clearly established constitutional rights. The resolution of this question "entails an inquiry into the nature and extent of the rights that [McEvoy] can assert, and whether [his] entitlement is well-settled." *Kaluczky,* 57 F.3d at 207. Because these underlying issues are "inextricably intertwined" with the qualified immunity issue, or are "necessary to ensure meaningful review" of that issue, *Swint v. Chambers County Commission,* 514 U.S. 35, 51, 115 S.Ct. 1203, 1212, 131 L.Ed.2d 60 (1995), we have discretion, on this interlocutory appeal, to exercise pendent jurisdiction over these related questions. We believe that there is "sufficient overlap in the factors relevant to the appealable and nonappealable issues to warrant our exercising plenary authority over the appeal" insofar as it concerns defendants Spencer and Christopher. *See San Filippo v. United States Trust Co. of New York,* 737 F.2d 246, 255 (2d Cir.1984) (quotations and brackets omitted).

## II. Qualified Immunity

The defense of qualified immunity shields government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A right is "clearly established" when "[t]he contours of the right [are] ... sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [T]he unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *see Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (court should look to following factors to determine whether right was clearly established at time defendant acted: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful"). A defendant pleading qualified immunity on a motion to dismiss is entitled to prevail if the allegations in the complaint fail to "state a claim of violation of clearly established law." *Behrens v. Pelletier,* — U.S. —, —, 116 S.Ct. 834, 839, 133 L.Ed.2d 773 (1996) (quotations omitted).

On its face, McEvoy's complaint appears to frame grievances that would bring it solely within the ambit of free speech cases like *Pickering.* The complaint explicitly alleges that both demotions were made because of McEvoy's vocal criticisms of the former Commissioner and because of his decision to petition the PERB or to file the present suit.[1] However, since, at least as to the first demotion (from Commissioner to Deputy Chief), the complaint also alleges that the defendants were motivated to reward a political ally, the complaint presents circumstances that might entitle the defendants to the insulation provided by cases like *Elrod.* The claim as to the first demotion therefore requires consideration of the distinction between the *Pickering* and the *Elrod* lines of decisions and poses the specific issue of whether an employer motivated to act against an employee for exercising both his speech and associational rights is insulated from liability by *Elrod.* The claim as to the second demotion (from Deputy Chief to Captain) appears to present only issues implicating the *Pickering* line of cases, but since the complaint alleges circumstances warranting a conclusion that McEvoy was a policymaker even after his first demotion, the second demotion poses the specific issue of the significance that should be attached to an employee's policymaking role in applying *Pickering.*

As our discussion below reveals, both issues were unsettled at the time of the demotions. As a result, the contours of the rights alleged to have been violated by Spencer and Christopher were not "sufficiently clear that a reasonable official would understand that what he was doing violates [those] right[s]," *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039, and these defendants are therefore entitled to qualified immunity. Moreover, our resolution of the first issue entitles Spencer and Christopher not only to qualified immunity but also to have the claim against them regarding the first demotion dismissed entirely.[2]

## III. The Relationship between *Pickering* and *Elrod*

Two lines of Supreme Court decisions define the parameters of a public employer's

1. McEvoy also alleges a violation of his First Amendment right to petition government for redress of grievances, based on his claim that defendants decided to demote him because he filed a grievance petition with the PERB and because he instituted the present suit. Because the right to petition and the right to free speech "are related and generally subject to the same constitutional analysis," *Wayte v. United States,* 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 1532 n. 11, 84 L.Ed.2d 547 (1985), we will not discuss separately McEvoy's right to petition claim.

2. Because we may not exercise pendent party appellate jurisdiction in the circumstances of this appeal, *see Swint,* 514 U.S. at 48–51, 115 S.Ct. at 1211–12, we make no ruling concerning claims against non-appellants City of Yonkers or the Union.

right to take adverse action against an employee for the exercise of First Amendment rights. The first set of cases, which includes *Pickering*, *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), generally governs a public employee's right to speak out on matters of public concern. The second set of cases, which includes *Elrod*, *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), generally governs a public employee's right to political affiliation or association. *See generally* Craig D. Singer, Comment, *Conduct and Belief: Public Employees' First Amendment Rights to Free Expression and Political Association*, 59 U. Chi. L.Rev. 897 (1992).

In *Pickering*, the Supreme Court established a balancing test for determining when a public employer may dismiss an employee for exercising the right to free expression. Although a citizen does not lose the right to speak on matters of public concern by accepting public employment, the Court recognized that the state, as an employer, has a strong interest "in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1735. In each case, the ultimate question is whether the employee's right to speak is outweighed by the public employer's interest in the effective operation of the workplace. Specifically, a court must assess the extent of the disruption caused by the employee's speech on workplace discipline, harmony among co-workers, working relationships, and the employee's job performance, and determine whether the disruption justifies the employer's attempt to stifle the employee's expressive activity. *Id.* at 569–73, 88 S.Ct. at 1735–37. In *Rankin*, the Court added another factor to this balancing:

> [S]ome attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.

483 U.S. at 390, 107 S.Ct. at 2900. If the harmful effects of the expression to the public workplace outweigh its benefits to the speaker-employee, then the employer is justified in taking adverse action against the employee in order to mitigate the negative effects.[3] Because of the "infinite variety of factual circumstances in which such conflicts might arise," the Court has not announced a general standard in this area, but has instead relied upon "an identification and weighing of competing interests on a case-by-case basis." James Kimmell, Jr., Note, *Politics and the Non–Civil Service Public Employee: A Categorical Approach to First Amendment Protection*, 85 Colum. L.Rev. 558, 560 (1985).

In contrast to the "*ad hoc* balancing" employed in the *Pickering* free speech analysis, the Supreme Court has employed in the *Elrod* line of cases a "categorical" approach for determining the parameters of a public employer's right to take adverse action against an employee on the basis of the employee's political affiliation or association. *See id.* at 560–62. The Court has ruled that the First Amendment prohibits so-called "patronage" dismissals of most low-level employees, but permits such dismissals for policymakers, those for whose positions the employer can establish that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295. This "policymaker" exception to the general prohibition against affiliation-motivated adverse actions was originally established in *Elrod*, in which the Court acknowledged that public employers have a legitimate "need for political loyalty of employees, not to the end that effectiveness and efficiency be ensured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." 427 U.S. at 367, 96 S.Ct. at

3. As with most "weighing" tasks assigned by the Supreme Court to courts of appeals and district courts, the calibration of weights has not been specified. The "weighing" metaphor conveys the appearance of precise quantification of competing interests, while tolerating in practice rather subjective qualitative consideration of the importance of the values at stake.

2687. However, because this governmental end can be sufficiently served by "[l]imiting patronage dismissals to policymaking positions," the Court also ruled that a public employer cannot rely upon its preference for politically loyal employees to justify the discharge of non-policymaking employees. *Id.*

The policymaker exception was subsequently refined by *Branti,* which ruled that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518; 100 S.Ct. at 1295. This Circuit has interpreted *Branti* 's version of the policymaker exception to mean that "political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance." *Savage v. Gorski,* 850 F.2d 64, 68 (2d Cir.1988). In the instant opinion, we will use "policymaker" as a "convenient shorthand for a person occupying a position calling for party loyalty" within the meaning of the *Elrod* line of cases. *See Regan v. Boogertman,* 984 F.2d 577, 580 (2d Cir.1993).[4]

**4.** Whether the *Pickering* balancing test or the *Elrod* categorical approach is applicable to a particular factual situation is clear at the extremes. For instance, where a low-level municipal employee is discharged after publicly stating that the Nation should spend less on defense and more on welfare, *Pickering,* not *Elrod,* applies, and the employee normally wins, unless the particular circumstances tip the *Pickering* balance in favor of the employer. *Cf. Rankin,* 483 U.S. at 381, 386–87, 107 S.Ct. at 2895, 2897–99 (*Pickering* analysis employed where deputy constable was discharged for voicing her approval of assassination attempt on President). On the other hand, where all of the high-level, confidential advisors to a former governor are discharged by the newly elected governor of the opposite party, simply because of their party affiliation, *Elrod,* not *Pickering,* applies, and the employees normally lose. *Cf. Savage,* 850 F.2d at 65, 68–69.

The difficulty comes in situations in which the clear line between speech on matters of public concern, on the one hand, and unexpressed political belief or association, on the other, becomes blurred. Where an employee is discharged by his public employer because he actively campaigned for or spoke out on behalf of the employer's electoral opponent, for instance, courts have struggled with the question of whether the *Pickering* or the *Elrod* test is applicable. In *Heideman v. Wirsing,* 7 F.3d 659 (7th Cir.1993), for instance, the Seventh Circuit relied upon the *Elrod* test to evaluate whether a county sheriff violated an employee's rights by taking adverse action against the employee for actively supporting and speaking on behalf of the sheriff's opponent in an upcoming election. *See id.* at 660, 661–63; *see also Wilbur v. Mahan,* 3 F.3d 214, 218–19 (7th Cir.1993); *Boogertman,* 984 F.2d at 581; *Rodriguez Rodriguez v. Munoz Munoz,* 808 F.2d 138, 143–45 (1st Cir.1986). However, in *Stough v. Gallagher,* 967 F.2d 1523 (11th Cir. 1992), the Eleventh Circuit employed the *Pickering* test in a nearly identical situation and rejected the defendant sheriff's argument that *Elrod* was applicable, reasoning that "this case primarily concerns [the employee's] political *speech* in support of [the sheriff's] opponent." *Id.* at 1528 (emphasis added); *see also Rogers v. Miller,* 57 F.3d 986 (11th Cir.1995); *McBee v. Jim Hogg County,* 730 F.2d 1009 (5th Cir.1984) (in banc).

Where a choice needs to be made between application of the *Pickering* and the *Elrod* lines of cases, the characterization of the distinction between the doctrines will often be determinative. Courts and commentators have offered several proposals. Some suggest a "rights-based" distinction under which a court is "to apply *Pickering* whenever the state fires an employee for *expressive conduct,* and to apply *Elrod* whenever the state fires an employee for holding political *beliefs* contrary to those of her employer." Comment, *supra,* at 918 (emphases added). Under this approach, whenever "the protected activity involves overt 'expression of ideas,' the more open-ended inquiry prescribed by *Pickering* " is applicable. *Jones v. Dodson,* 727 F.2d 1329, 1335 n. 6 (4th Cir.1984).

Others contend that whether the *Pickering* or the *Elrod* test is to be "utilized depends on the manner in which the exercise of an employee's First Amendment rights may impede the effective functioning of the public office in question." *Heideman,* 7 F.3d at 662. Under this approach, if the employee's conduct disrupts the efficient functioning of the governmental workplace, then *Pickering* is applicable; however, if the employee's activities raise doubts about his loyalty and ability to implement the employer's policies, then *Elrod* is appropriate.

Still others appear to reject both of the above proposals and suggest that the crucial distinction is between political activity in connection with an election or a campaign, and expressive activity unrelated to a political contest. *Cf. Rodriguez Rodriguez,* 808 F.2d at 143–45. This Circuit, for instance, has employed the *Elrod* test where an employee was discharged by his public employer for actively opposing the employer's party and endorsing candidates from an opposing party. *See Boogertman,* 984 F.2d at 581. Rejecting the employee's contention that *Pickering* was the applicable precedent because expressive *conduct* was at issue, we stated that

> [this employee], unlike [the employee in *Pickering* ], was fired for partisan political reasons, namely her conduct in opposition to the reelec-

The pending case presents two distinct issues arising out of the relationship between the *Pickering* and the *Elrod* lines of cases. As the following discussion demonstrates, neither issue was clearly settled at the time of McEvoy's two demotions.

(a) *Does* Elrod *Insulate an Employer Motivated Both by the Political Affiliation and the Speech Activities of an Employee?*

The first issue—relevant to McEvoy's demotion from Commissioner to Deputy Chief—arises when adverse action is taken against a policymaking employee *both* because of political affiliation and speech. The narrow issue posed by that circumstance is whether adverse action that *Elrod* permits on the ground of political affiliation is precluded because the action was also motivated by speech that *Pickering* arguably protects.[5] This is a variant of the dual motivation problem that occasionally arises in cases involving activity protected by the First Amendment, *see Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Title VII, *see Price Waterhouse v. Hopkins,* 490 U.S. 228, 240–41, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion); the Age Discrimination in Employment Act, *see Ostrowski v. Atlantic Mutual Insurance Cos.,* 968 F.2d 171, 180 (2d Cir.1992); or the National Labor Relations Act, *see Holo-Krome Co. v. NLRB,* 954 F.2d 108, 110 (2d Cir.1992). In the typical dual motivation case, however, a defendant accused of acting for an impermissible reason asserts, as an affirmative defense, that it *would have taken* the same action for a permissible reason. In the pending case, the defendants are accused of acting against a policymaking employee for both a permissible reason (political association unprotected by *Elrod*) and an impermissible reason (speech arguably protected under *Pickering*). In this context, where the lines between political association and speech are often blurred, we conclude that adverse action may be taken against a policymaker because of political affiliation, even if the employer was also motivated in part by speech protected under *Pickering.* The employer need not persuade the trier that it would have acted against the policymaker solely because of political affiliation. If it in fact acted, at least in part, for that reason, the adverse action is lawful under *Elrod.*

We have found no previous decision that has fully considered this question. More-

tion of the incumbent officeholders. In a case like [this], where an employee is fired for *partisan political conduct or affiliation* a court should balance the employee's interest in free political belief and association against the government's interest in "securing employees who will loyally implement its policies." If the employee holds a policymaking position, the government's interest becomes paramount.

*Id.* at 581, 88 S.Ct. at 1741 (emphasis added) (citing *Rutan,* 497 U.S. at 74, 110 S.Ct. at 2736–37). Even where the discharge was motivated by the employee's expressive conduct, therefore, *Elrod* is applicable so long as this conduct occurred during a political contest of some sort. *See also Kaluczky,* 57 F.3d at 208 ("Policymakers hold their office at the will of their employer, and may be discharged by reason of *political affiliations, political beliefs, ideological viewpoints or partisan activity.*") (emphasis added).

5. This issue is different from the one confronted by the opinions discussed in the preceding footnote. In *Heideman* and *Stough,* for instance, the question was whether, under the facts presented, the case should be characterized as a political affiliation case governed by *Elrod, or* whether it should be characterized as a speech case governed by *Pickering.* Because the employee's conduct—speaking out in favor of his employer's opponent in a political election, for instance—could be characterized as either an exercise of his speech rights or an exercise of his political affiliation rights, the courts were divided on the question of whether the *Pickering* balancing test or the *Elrod* categorical approach should be applied. *Compare, e.g., Heideman,* 7 F.3d at 661–63 (relying on *Elrod* test) *with Stough,* 967 F.2d at 1528 (relying on *Pickering* test).

McEvoy's demotion from Commissioner to Deputy Chief, however, was motivated by two distinct and independent considerations—one involving McEvoy's critical speech and the other involving McEvoy's political association. The first demotion thus does not present the situation faced by *Heideman* and *Stough,* in which a single "hybrid" motivation, which could arguably be characterized as either the employee's political affiliation rights or the employee's free speech rights, underlies the employer's decision. Rather, two independent motivations are alleged in the complaint to explain McEvoy's initial demotion: he was replaced by Christopher as Commissioner (1) in response to his public criticisms of the police department and the Union, and (2) as a reward for the newly elected mayor's political supporters.

over, we acknowledge some unease about our conclusion that an employer is not liable when both a permissible consideration (the employee's political affiliation) and an impermissible consideration (the employee's speech) motivated its decision. In the Title VII context, for instance, it is well established that where the employee proves that his employer took adverse action against him for both a legitimate reason (the employee's chronic tardiness, for instance) and an illegitimate reason (the employee's race, for instance), the employer is liable, at least for some relief. *See, e.g., Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 120 (2d Cir.1997) (plaintiff may prevail by proving that "an impermissible reason, even though not the only reason for an adverse employment decision, was a 'substantial' or 'motivating' factor, or 'made a difference' in the decision"). This rule—that an employer motivated to act by a combination of permissible and impermissible reasons is liable to the employee—appears in other contexts as well. *See, e.g., Cronin v. Aetna Life Insurance Co.,* 46 F.3d 196, 203 (2d Cir.1995) (ADEA) ("[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.") (citing *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1788–89 (plurality opinion)).

Nonetheless, we deem this general rule inappropriate to the context of politically motivated actions because of the special concerns present in situations in which a policymaking employee, whose political beliefs alone subject him to dismissal, creates additional basis for concern by his employer by speaking out on controversial matters. In *Branti,* the Supreme Court noted that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." 445 U.S. at 517, 100 S.Ct. at 1294. It would seem, then, that where such an employee's speech activities contributed to further interference with the discharge of his public duties, an employer should be no more constrained in acting against the employee than if the employee had remained silent. Application of the general dual motivation rule in this context, however, would lead to precisely the opposite result: a policymaker who additionally disrupts the public workplace and undermines his relationship with the employer by exercising his speech rights would be more protected than a similarly situated employee who remains silent and merely "quietly, inoffensively, undemonstratively belongs to the wrong political party." *Wilbur v. Mahan,* 3 F.3d 214, 218 (7th Cir. 1993). We therefore conclude that since a public employer is permitted to dismiss or demote a policymaking employee merely because it dislikes the employee's political affiliation, the employer should be permitted to take the same action when the employee not only belongs to a disfavored party or holds the "wrong" political beliefs, but additionally disrupts the workplace by speaking out. *Cf. id.* at 219 ("It would be a strange rule that gave more job protection to policymaking employees who vociferously attack their superiors than to policymaking employees who do their best to serve those superiors faithfully but have the misfortune to belong to the wrong party. It would give policymaking employees and other sensitive employees an incentive to attack their bosses in order to retain their jobs.").

We caution that our decision on this point does not immunize a public employer when its adverse action against a policymaking employee was not even in part motivated by the employee's political affiliation. Where the evidence shows that the employer discharged a policymaker solely for speaking out on matters of public concern, and that the policymaker's political beliefs played no role in the employer's decision, *Elrod* is inapplicable and *Pickering* must be applied,[6] although how it should be applied

6. Such evidence might be present, for example, if an employer retained several policymakers, all of whom could have been discharged under *Elrod,* and then discharged one of these policymakers

remains for consideration in Part III(b), *infra.* Moreover, employers should understand that our decision does not immunize adverse employment actions motivated partially by the policymaking employee's political affiliation and partially by impermissible factors such as the employee's race, sex, or national origin. Where the evidence demonstrates that the employer discharged a policymaker both because he belonged to the wrong political party and because he was Black, for instance, the general dual motivation rule would apply, and the employer would be liable. In short, we limit the present ruling to situations in which the adverse action taken against a policymaking employee is motivated by both the employee's political affiliation and by the employee's speech.[7]

(b) *Is There a Policymaker Exception to the* Pickering *Balancing Test?*

The second issue—relevant to McEvoy's demotion from Deputy Chief to Captain—arises when an employer takes adverse action against an employee who would qualify as a policymaker within the meaning of the *Elrod* line of cases, but the action is taken solely in response to the employee's exercise of his *Pickering*-protected speech rights. The precise issue is whether there is a policymaker exception to *Pickering* balancing that immunizes the employer's adverse action, or whether the employee's policymaking status is merely one factor to be considered in determining whether the employer's right to prevent disruptions in the workplace outweighs the employee's right to speak out on matters of public concern.

Although some courts have suggested that a dispositive policymaker exception also exists in the *Pickering* context, *see, e.g., Wilbur,* 3 F.3d at 217–19; *see also* Leon Friedman, *New Developments in Civil Rights Litigation and Trends in Section 1983 Actions,* SB24 ALI–ABA 295, 368 (1996) ("*New Developments* ") ("[S]ome courts have held that policymaking exception recognized in *Elrod–Branti* situations apply also when adverse action [is] taken against public employee because of exercise of free speech."), we reject such a position. As the Supreme Court has noted on several occasions, the nature of the job held by the plaintiff-employee plays a significant, but not dispositive, role in the *Pickering* balance. In *Pickering* itself, for instance, the Court, in the context of recognizing that whether the employee's statement impairs discipline, disrupts harmony among co-workers, has a detrimental impact on close working relationships, or impedes the speaker's performance of his job all play a role in the balancing test, also noted the following:

> It is possible to conceive of some positions in public employment in which the need for confidentiality is so great ... [, or] in which the relationship between superior and subordinate is of such a personal and intimate nature[,] that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them.... We intimate no views as to how we would resolve any specific instance of such situations, but merely note that significantly different considerations would be involved in such cases.

391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3. Nowhere in *Pickering* did the Court suggest that the policymaking nature of an employee's position would *automatically* permit the employer to take action against him in response to his exercise of free speech rights. More recently, the Court in *Rankin* explicitly expanded upon *Pickering* 's list of the relevant factors for determining the significance of the public employer's interest:

> [I]n weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, *some attention must be paid to the responsibilities of the employee* within the agency. *The*

shortly after the dismissed employee made a speech that would be protected under *Pickering.*

7. We do not reach the question of whether an employer should prevail when a policymaking employee demonstrates that his discharge or demotion was motivated at least in part by three circumstances—his political affiliation, his speech activities, and an impermissible factor such as his race.

*burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.* Where, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal.

483 U.S. at 390–91, 107 S.Ct. at 2900 (emphases added). "[T]he more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *Singer, supra,* at 901; *see also Caruso v. DeLuca,* 81 F.3d 666, 670 n. 3 (7th Cir.1996); *Hall v. Ford,* 856 F.2d 255, 261–64 (D.C.Cir.1988).

In sum, although the Supreme Court has ruled that the policymaking status of an employee is relevant to the *Pickering* analysis, it has never stated that the discharged employee's position in the employment hierarchy would automatically tilt the *Pickering* balance in the employer's favor. We therefore read *Pickering* and its progeny as holding that the policymaking status of the discharged or demoted employee is very significant in the *Pickering* balance, but not conclusive. That the nature of the employee's position is important to the free speech balancing test should not be surprising. Common sense tells us that the expressive activities of a highly placed supervisory, confidential, policymaking, or advisory employee will be more disruptive to the operation of the workplace than similar activity by a low level employee with little authority or discretion. *See, e.g., Bates v. Hunt,* 3 F.3d 374, 378 (11th Cir.1993) ("For some categories of employees such as those in a confidential or policy-making relation to their public employer, First Amendment constitutional protection is often slight."); *Kinsey v. Salado Independent School District,* 950 F.2d 988, 994 (5th Cir.1992) (noting that "government's interests more easily outweigh the employee's" in *Pickering* cases that "involv[e] public employees who occupy policymaker or confidential positions"). Indeed, where the employee holds an extremely confidential or highly placed advisory position, it would be unlikely if the *Pickering* balance were to be struck in his favor. The tremendous disruption to the public workplace likely to result from the critical speech of such an employee would in most cases outweigh any First Amendment interests possessed by that employee. *Cf. Kaluczky,* 57 F.3d at 209.

A somewhat closer question is whether the lack of a policymaker exception to *Pickering* was clearly established at the time of McEvoy's second demotion. *Kaluczky* provides some indication that it settled the point by stating that "there is no explicit *Elrod–Branti* policymaker exception to the *Pickering* line of cases." 57 F.3d at 210. But even this sentence left open the possibility of an implicit exception, a view supported by the Court's observation that "the governmental interests recognized in both lines of cases [*Elrod* and *Pickering*] are essentially the same." *Id.* Moreover, *Kaluczky* did not have to decide the analytical significance of a policymaker role in a case, like ours, where adverse employment action (the second demotion) is taken solely because of speech. In *Kaluczky* the measures allegedly taken to punish the employee for his speech were exactly the same as those allegedly taken against him "as a policymaker in the administration of the rival political party." *Id.* Indeed, Professor Friedman has read *Kaluczky* as *supporting* a policymaker exception to *Pickering*. *See New Developments, supra,* at 368. Although we do not think *Kaluczky* went so far, we are persuaded that at the time of McEvoy's second demotion the issue of a policymaker exception to *Pickering* was not definitively settled *against* employers. We now rule, consistent with our understanding of *Pickering* and *Kaluczky,* that in a pure *Pickering* case, an employee's policymaking role does not provide an employer with complete insulation for adverse employment action, but does weigh, normally heavily, on the employer's side in the *Pickering* balance.

IV. Application of Law to Plaintiff's Claims

(a) *First Demotion: From Police Commissioner to Deputy Chief.* Two aspects of the complaint, considered together, demonstrate not only that Spencer and Christopher are entitled to qualified immunity with respect to McEvoy's demotion from

Police Commissioner to Deputy Chief, but also that there can be no liability at all for them arising from this demotion.

First, the complaint alleges facts demonstrating that the position of Police Commissioner in the City of Yonkers is a policymaking one. The Commissioner is directly appointed by the Mayor, possesses the authority to make substantial changes to every aspect of the police department's administration, and is ultimately responsible for all facets of the department's day-to-day operation. This position is unquestionably one for which appointing authorities may require compatible political affiliation, under the criteria applicable to *Elrod* cases in this Circuit. As to this position, there is a "rational connection between shared ideology and job performance." *Boogertman,* 984 F.2d at 580 (quotations omitted); *see Vezzetti v. Pellegrini,* 22 F.3d 483, 486 (2d Cir.1994) (factors for determining whether position is one "'calling for political loyalty'" include: "whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders") (citation omitted).

Second, the complaint alleges that the first demotion was motivated both by McEvoy's speech, *see* Supplemental Complaint ¶ 24 (alleging that Spencer's decision to replace McEvoy with Christopher "was intended both to benefit himself personally and the [Union] by silencing Plaintiff, preventing Plaintiff from pursuing *inter alia* the PERB petition, and punishing Plaintiff for having advocated reform"), and by his political affiliation, *see* Supplemental Complaint ¶¶ 17 & 18 (alleging that although McEvoy was originally Spencer's preferred choice as Commissioner, Spencer agreed to replace McEvoy with Christopher, if elected, in exchange for the Union's political and financial support in the mayoral campaign). Although the speech-based allegations are more prominent, the complaint also alleges that Spencer decided to demote the plaintiff because Spencer's political friends conditioned their support for him on the removal of McEvoy and the appointment of Christopher.[8] While still a candidate for office, Spencer had promised the Union—McEvoy's political enemy—that if it provided him with a public endorsement and financial support during the mayoral campaign, he would replace McEvoy, the appointee of the mayoral candidate competing against Spencer, with the Union's preferred person for Commissioner, defendant Christopher. The Union placed its support behind Spencer, and the new Mayor, immediately following his victory, fulfilled his election promise of removing McEvoy and replacing him with Christopher.

Thus, McEvoy himself has alleged that (1) he was a policymaker at the time of the first demotion, and (2) he was demoted both for exercising his speech rights and for his political affiliation or association. As we previously discussed, whether an employer possessed the right to act against a policymaking employee for both permissible *Elrod* reasons and impermissible *Pickering* reasons was an open and unsettled question at the time of the first demotion. Spencer and Christopher are therefore entitled at least to qualified immunity with respect to the first demotion. Moreover, because we have concluded that

8. Although there is no allegation in the complaint that McEvoy belonged to a political party different from Spencer's, or that McEvoy campaigned on behalf of Spencer's opponent, Zaleski, the complaint does allege that McEvoy and the Union held contrary ideological viewpoints concerning the proper administration of the Yonkers police department. Having become the political enemy of McEvoy, the Union decided to throw its support behind the mayoral candidate, Spencer, who did not appoint McEvoy and who, if elected, would have the power to remove McEvoy. Spencer, having obtained the support of the Union, became, by association, the political opponent of McEvoy as well. Though the more familiar saying is, "The enemy of my enemy is my friend," the defendants apparently adapted the saying to become, "The enemy of my friend is my enemy." McEvoy, the Union's political enemy, became the political enemy of Spencer when the Union became the mayor-elect's political friend. Although the obvious element of battling political parties was missing, other elements common to an *Elrod*-type political association case were present in abundance.

an employer who takes action against a policymaker for both *Elrod* and *Pickering* considerations is insulated from all liability, McEvoy's first claim, insofar as it concerns Spencer and Christopher, must be dismissed in its entirety.

(b) *Second Demotion: From Deputy Chief to Captain.* In contrast to its dual allegations concerning the first demotion, McEvoy's complaint as to the second demotion alleges that only one consideration motivated the defendants' decision to demote him from Deputy Chief to Captain: retaliation for his free speech activity in filing the original complaint in the present suit. Such a claim calls for a *Pickering* free speech analysis and a determination of whether the plaintiff's free speech interest is outweighed by the public employer's efficiency interest. Though that analysis will often require assessment by the fact-finder on a fully developed record, qualified immunity protects Spencer and Christopher in this case because (1) it was objectively reasonable for these defendants to believe that McEvoy's position as Deputy Chief was a policymaking one, and (2) the law was unsettled at the time of the second demotion as to whether a policymaker exception was available in a *Pickering* case.

First, although the record at this stage does not permit an ultimate decision as to whether the Deputy Chief position is a policymaking one, the available record adequately supports the defendants' claim that it was objectively reasonable for them to believe that it was. Under the Yonkers City Charter, the Police Commissioner has the authority to appoint three Deputy Chiefs (referred to as "Inspectors" in that document) who are placed in charge of, respectively, Investigative Services, Support Services, and Field Services. Yonkers City Charter § C12–1. Although the complaint does not specify which kind of Deputy Chief McEvoy was, he was in charge of a third of the functions of the entire police department. Moreover, under New York law, when the Commissioner is absent, McEvoy, as Deputy Chief, would potentially have authority to speak on behalf of the department, control the overall supervision of the department, discipline members of the department, and control the city jail. *See* N.Y. Pub. Off. Law § 9 (McKinney 1988). We have recently ruled that the fact that an employee "is empowered to act and speak on behalf of a policymaker" is of "primary importance" in determining whether he is a policymaker. *See Gordon v. County of Rockland,* 110 F.3d 886, 890 (2d Cir.1997). Additionally, we note that at least two other Circuits had concluded by the time of McEvoy's second demotion that the analogous position of Deputy Sheriff is a policymaking one. *See Wilbur,* 3 F.3d at 218; *Terry v. Cook,* 866 F.2d 373, 377 (11th Cir.1989). Under such circumstances, it was objectively reasonable for defendants Spencer and Christopher to believe that McEvoy was still a policymaker when he was demoted from Deputy Chief to Captain in April 1996.[9]

Second, as we have previously discussed, the law was unsettled regarding whether an employee's policymaking status automatically immunized an employer's adverse action even in a pure *Pickering* case. Although we decide in this opinion that no dispositive policymaker exception exists in the *Pickering* balancing test, Spencer and Christopher did not violate a clearly established right of McEvoy's when, reasonably believing that he was a policymaker, they demoted him from Deputy Chief to Captain because of speech activities. They are therefore entitled to qualified immunity on this claim.

## Conclusion

For the foregoing reasons, we reverse the District Court's order denying the motion of defendants Spencer and Christopher to dismiss on the ground of qualified immunity. Moreover, as to these defendants, we dismiss McEvoy's first cause of action, based on his January 1996 demotion to Deputy Chief, in its entirety because we rule that their action was justified by the policymaker exception established in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). We remand to the District Court for further proceedings concerning remaining issues

9. The issue of whether the position of Deputy Chief in the Yonkers Police Department is in fact a policymaking position may well have to be further explored and definitively determined in order to resolve other issues remaining in this litigation. *See, e.g., Vezzetti,* 22 F.3d at 486.

with respect to defendants not parties to this appeal and with respect to McEvoy's second cause of action.