Nicolle **QUENTAL, Plaintiff,**

v.

State of **CONNECTICUT COMMISSION on the DEAF AND HEARING IMPAIRED and Stacie J. Mawson (Eusko), Executive Director in both her Official and Individual Capacities, Defendants.**

No. Civ. 3:99CV00050AVC.

United States District Court,
D. Connecticut.

Aug. 17, 2000.

---

---

## MEMORANDUM OF DECISION RE CROSS MOTIONS FOR SUMMARY JUDGMENT

COVELLO, Chief Judge.

This is an action for damages and declaratory relief alleging violations of the plaintiff's constitutional and statutory rights of freedom of speech, free exercise of religion[1] and the guarantee of equal protection under the law.[2] It is brought pursuant to 42 U.S.C. § 1983[3], 42 U.S.C. § 2000e, *et seq.*[4] and Connecticut General Statutes § 52–571b.[5] The plaintiff, Nicolle Quental, alleges that the defendants, the State of Connecticut Commission on the Deaf and Hearing Impaired (the "Commission") as her employer, and Stacie Mawson as the Commission's executive director, willfully interfered with Quental's exercise of her constitutional rights by sending her a written letter of reprimand for promoting her religious beliefs to clients while on work assignments and further warning her that recurrences of such behavior may result in further disciplinary action, up to and including dismissal.

The plaintiff and the defendants have each filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c)[6], arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

The issues presented are: 1) whether the Commission's interest in avoiding a disruption of the workplace, maintaining efficiency in the workplace and avoiding a violation of the Establishment Clause outweighs the plaintiff's interest in expressing her religious beliefs to a client while on an interpreting assignment; 2) whether

---

1. The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const., amend. I.

2. The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

3. 42 U.S.C. § 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...."

4. 42 U.S.C. § 2000e provides a cause of action for "unlawful employment practices," which includes discrimination on the basis of "race, color, religion, sex or national origin."

5. Conn.Gen.Stat. § 52–571b provides that:

(a) The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) The state or any political subdivision of the state may burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest.

(c) A person whose exercise of religion has been burdened in violation of the provisions of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the state or any political subdivision of the state.

6. Fed.R.Civ.P. 56(c) states that summary judgment may be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

Quental has adduced evidence showing that the defendants selectively treated her in enforcing the Commission's policies or that their enforcement of the policies was motivated by a discriminatory purpose; and 3) whether the Commission reasonably accommodated Quental's religious practices, or to the extent that it did not, whether it could do so without undue hardship.

For the following reasons, the court concludes that: 1) the Commission's interest in avoiding a disruption of the workplace, maintaining efficiency in the workplace and avoiding a violation of the Establishment Clause outweighs the plaintiff's interest in expressing her religious beliefs to a client while on an interpreting assignment; 2) Quental has failed to adduce evidence showing that the defendants selectively treated her in enforcing the Commission's policies or that their enforcement of the policies was motivated by a discriminatory purpose; and 3) the Commission reasonably accommodated Quental's religious practices, and to the extent that it did not, it could not do so without undue hardship. Accordingly, the defendants' motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied.

## FACTS

Examination of the complaint, affidavits, pleadings, exhibits, supplemental materials and the Rule 9(c) statements of material fact accompanying the motions for summary judgment, and the responses thereto, discloses the following undisputed material facts:

Quental is an employee of the State of Connecticut who works as an interpreter for the Commission. As part of her duties, Quental provides interpreting services for deaf or hearing impaired "clients." Among the clients that Quental serves are persons with mental health disabilities.

Mawson is employed by the Commission and has been Quental's supervisor, as either an interpreter coordinator or executive director of the Commission, since 1994. Mawson testified that in the last two years, the Commission reprimanded at least three other employees for violating the Commission's policies.

Sometime after the Commission hired Quental, she took and passed a written examination on the national Registry of Interpreters for the Deaf ("RID") Code of Ethics. This code is a national standard of ethics that interpreters follow when providing interpreting services. In addition, this code is expressly made part of the collective bargaining agreement governing Quental's employment by the Commission, as evidenced by the supplemental letter of agreement to the collective bargaining agreement, which states that the code "shall be honored by both the Commission and its employees." Further, Quental testified that she understood that this code is part of the terms and conditions of her employment with the Commission.

The RID code of ethics provides, in relevant part, that "[i]nterpreters/transliterators shall not counsel, advise or interject personal opinions.... Just as interpreters/transliterators may not omit anything which is said, they also may not add anything to the situation.... [T]he interpreter/transliterator's only function is to facilitate communication. He/she shall not become personally involved...."

In 1996, Quental was on an interpreting assignment for the Commission at Cedarcrest, a mental health facility. During a break in the interpreting session, Quental engaged in a conversation with the client about smoking. Specifically, Quental informed the client that she had previously smoked, but that "the Lord had delivered [her] from smoking." Further, Quental asked the client if she could pray for him so that he might quit smoking as well. Quental then verbally prayed for the client in his presence. The client informed Mawson of the incident the next day. Thereafter, Mawson met with Quental and in-

formed her that it was inappropriate to pray for a client in the client's presence, especially a client in a mental health facility. Quental testified that she understood Mawson's instruction to mean that she should not pray for clients in their presence, especially mentally disabled clients because "you don't know what could set them off."

On October 20, 1997, Quental was on an interpreting assignment for the Commission at the University of Connecticut Health Center (the "UConn assignment"). During the "language assessment" period of the UConn assignment,[7] Quental shared some of her personal history and religious beliefs with the client. Specifically, in response to the client's comment that she had been sexually abused, Quental informed the client that she had "a relationship with the Lord" and that "God had helped [her] in [her] past dealing with [her] past and [that] he could help her also." Quental further informed the client that she "used to smoke and that the Lord [had] delivered [her] from that." Quental then gave the client certain religious "tracts." These tracts, entitled "Should I go to church?," "the Key" and "What Does It Mean to Believe," contained passages from the Bible and were stamped with the name of an East Hartford, Connecticut church, the First Assembly of God. Quental testified that even though she had already learned the client's signing style at the time of this conversation, she engaged in the conversation about her religious beliefs and shared the tracts with the client because "it was obvious that [the client] was very upset" and that Quental was "hopeful that [her conversation] would give her hope."

On or about October 22, 1997, Karen Wilson, a representative of the Mental Health Association of Connecticut, Inc., contacted the Commission to complain about Quental's conduct while on the UConn assignment. According to Wilson, the client, a mental health patient, was agitated by Quental's conduct. Specifically, Wilson reported that the client was emotionally upset by the incident and that while signing to Wilson, the client had "very strong signs, and she was very gestural that, I don't want (sic) preach religion." Wilson further testified that "some people who have mental health problems have delusional systems around religious icons and religio[n]," that "religion kind of spooked" the client at the UConn assignment and that the mentally ill "can both be paranoid about [religion] or embrace it."

The Commission conducted an investigation of Wilson's complaint. As a result of the investigation, on March 5, 1998, the Commission issued a letter of reprimand to Quental. The reprimand letter stated, in relevant part, that Quental was "free to hold [her] religious beliefs and live by [her] religious convictions, [but that] during the time [she is] being paid by the State of Connecticut to provide interpreting services, [she] should not promote [her] religious beliefs." The letter further stated that "[t]he Commission recognizes the depth and importance of [Quental's] religious beliefs, and is always willing to work with [her] on any scheduling issues that may need to be addressed to accommodate [her] religious activities." In addition, the letter stated that "[a]ny further recurrences of this type of behavior may result in further disciplinary action, up to and including dismissal."

On January 12, 1999, Quental brought this action.

### STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby,*

---

7. The language assessment period is where the interpreter engages in "small talk" with the client using "sign" language, before the start of actual interpretation in order to determine the client's "signing style."

*Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991); *see also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992).

## DISCUSSION

### I. *First Amendment Causes of Action*

The defendants first argue that the plaintiff's First Amendment causes of action fail, as a matter of law, because under the United States Supreme Court's balancing test enunciated in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the defendants did not violate the plaintiff's First Amendment rights by reprimanding her for her conduct. Specifically, the defendants argue that under the balancing test in *Pickering,* the Commission's interest in avoiding a disruption of the workplace, maintaining efficiency in the workplace and avoiding a violation of the Establishment Clause outweighs the plaintiff's interest in expressing her religious beliefs to a client while on an interpreting assignment.

In response, the plaintiff "concedes that conduct and or (sic) speech which is proven to be disruptive to the employer or to the workplace is not protected speech," but argues that there is no evidence to support the allegation that the plaintiff's speech and/or conduct was disruptive. The plaintiff further argues that "[t]he Establishment Clause does not provide the government with any justification for restricting

religious activity in the workplace." Specifically, the plaintiff argues that her speech "can never violate the Establishment Clause, even though she is a government employee, because she is a private citizen" and that "speech by individual government employees could [never] trigger a violation of the Establishment Clause." The plaintiff further argues that "there can be no reasonable conclusion that Mrs. Quental was acting on behalf of the state and that she was expressing a state-endorsed religion."

■ "[A] State may not [discipline] an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. Mc Pherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). However, "[t]he determination whether a public employer has violated the First Amendment by [disciplining] a public employee for engaging in speech requires [the court to] balance the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lewis v. Cowen,* 165 F.3d 154, 161 (2d Cir.1999) (internal quotation marks omitted); *see Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

■ When balancing the public employee's and public employer's interests, "a court should consider both the nature of the speech and the nature of the services performed by the employee." *Blum v. Schlegel,* 18 F.3d 1005, 1011 (2d Cir.1994). "The more the employee's job requires ... public contact, the greater the state's interest in [disciplining] her for expression that offends her employer." *Lewis,* 165 F.3d at 162. Furthermore, "a court must consider whether the statement sought to

be protected ... has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Lewis,* 165 F.3d at 162; *see also Rankin,* 483 U.S. at 388, 107 S.Ct. 2891.

■ "If the harmful effects of the expression to the public workplace outweigh its benefits to the speaker-employee, then the employer is justified in taking adverse action against the employee in order to mitigate the negative effects." *McEvoy v. Spencer,* 124 F.3d 92, 98 (2d Cir.1997). Although "[t]he government bears the burden of demonstrating that the speech threatens to interfere with government operations," the government "need show only a likely interference with its operations, and not an actual disruption." *Lewis v. Cowen,* 165 F.3d 154, 162–63 (2d Cir.1999) (internal quotation marks omitted). "The Constitution provides a State with greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions." *Lewis,* 165 F.3d at 161.

■ In the present case, the defendants have presented sufficient evidence showing that Quental's conduct during the UConn assignment interfered with the Commission's efficient operation, or at the very least, if allowed to continue in future assignments, would "likely interfere with its operations." *See Lewis,* 165 F.3d at 162–63. Wilson testified that the client at the UConn assignment was agitated and emotionally upset by Quental's conduct and that the client had "very strong signs, and she was very gestural that, I don't want

(sic) preach religion." Wilson further testified that "some people who have mental health problems have delusional systems around religious icons and religio[n]," that "religion kind of spooked" the client at the UConn assignment and that the mentally ill "can both be paranoid about [religion] or embrace it." Quental works with mentally ill clients and does not necessarily know from one assignment to the next whether a particular client may be mentally ill. Quental's sole function at these assignments, as aptly described in the RID code of ethics, is to "facilitate communication" between the hearing impaired client and others. If Quental's clients become agitated, emotionally upset, spooked and/or paranoid by Quental's speech during a break in the interpreting or during the language assessment portion of the assignment, it may very well impede the ability of the client to communicate effectively with Quental, and thus, with the intended listener.

Furthermore, the defendants' interest in avoiding a violation of the Establishment Clause is a sufficient basis for the defendants to suppress Quental's speech under the facts in this case. "[G]overnment inculcation of religious beliefs has the impermissible effect of advancing religion." *Agostini v. Felton,* 521 U.S. 203, 223, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).[8] "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief...." *County of Allegheny v. ACLU,* 492 U.S. 573, 592–94, 109 S.Ct. 3086, 106 L.Ed.2d 472. "[T]he interest of the State

8. It is worth noting the *Agostini* Court's explanation of its rationale in a prior Establishment Clause case, *Zobrest v. Catalina Foothills School District,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). In *Zobrest,* the Court held that the government had not violated the Establishment Clause where it supplied an interpreter to a parochial school. The *Agostini* Court explained that in reaching its decision in *Zobrest,* it assumed "that the interpreter would dutifully discharge her responsibilities as a full-time public employee and comply with the ethical guidelines of her profession by accurately translating what was said. Because the only government aid in *Zobrest* was the interpreter, *who was herself not inculcating any religious messages,* no government indoctrination took place and we were able to conclude that the provision of such assistance [was] not barred by the Establishment Clause." *Agostini v. Felton,* 521 U.S. 203, 223, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (emphasis added).

in avoiding an Establishment Clause violation may be [a] compelling one justifying an abridgment of free speech otherwise protected by the First Amendment." *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352; *see also Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). "[W]hen government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well be protected by the Free Exercise Clause if the individual were not acting as an agent of government." *Marchi v. Board of Co–op. Educ. Svcs.*, 173 F.3d 469, 476 (2d Cir.1999); *see also Peloza v. Capistrano Unified School District*, 37 F.3d 517 (9th Cir.1994) (teacher prohibited from discussing religion with students during the school day).

Here, Quental is a state employee interacting with the public during her interpreting assignments. There is a risk that at least some of these clients may be mentally ill and may have "delusional systems" with respect to religion. These clients could confuse Quental's statements concerning her religious beliefs and distribution of religious tracts from the First Assembly of God church as the Commission's endorsement of religion and/or the First Assembly of God church. The Commission's interest in avoiding this confusion outweighs the light burden placed on Quental's First Amendment rights, i.e., that she may not express her religious beliefs to a client while on an interpreting assignment for the Commission.

Based upon the foregoing, the court concludes that the Commission's interest in avoiding a disruption of the workplace, maintaining efficiency in the workplace and avoiding a violation of the Establishment Clause outweighs the plaintiff's interest in expressing her religious beliefs to a client while on an interpreting assignment. Accordingly, the Commission's reprimand of Quental did not violate Quental's First Amendment rights and her First Amendment causes of action fail as a matter of law.

## II. *Equal Protection Cause of Action*

Quental's also seeks relief pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Quental alleges that as an employee with a "religious perspective", she is "not given recognition and provided with the corresponding benefits that go along with such recognition" while "[s]imilarly situated employees that do not have a religious perspective are recognized by the Defendants and enjoy the many benefits that are associated with such recognition." Specifically, Quental claims that the defendants have treated her differently than similarly situated employees "solely because of her religious viewpoint and the expression" of that viewpoint.

The defendants argue that Quental's equal protection cause of action fails as a matter of law because "the defendants' actions establish no ... discriminatory intent to punish or single out an identifiable group." Specifically, the defendants argue that the RID code of ethics "does not prohibit religious expression or religious proselytizing *per se*, but rather prohibits interjection of *any* personal counsel, advice or opinions, regardless of its origin or basis."

Quental does not respond to this argument. Instead, Quental argues that although "other employees have been disciplined for infractions while in the course of their employment, none has (sic) been disciplined for religious expression."

In order to establish an Equal Protection violation based upon selective application of a facially lawful policy, the plaintiff must show that "(1) the person, compared with others similarly situated,

was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir.1992) (citing *Wayte v. United States*, 470 U.S. 598, 608–09, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). "A plaintiff is required to show not only that the state action complained of had a disproportionate or discriminatory impact but also that the action was taken with intent to discriminate." *U.S. v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir.1996) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). The plaintiff must show "that the decision-makers in [her] case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). "Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Hayden v. County of Nassau*, 180 F.3d 42, 50 (2d Cir.1999).

█ Here, Quental has failed to adduce any evidence that would show that the defendants selectively treated Quental in enforcing the Commission's policies against her. Quental has produced no evidence that the Commission failed to reprimand other employees who violated the Commission's policies. In fact, Mawson testified that in the last two years, the Commission reprimanded at least three other employees for violating the Commission's policies.

Furthermore, Quental has failed to adduce any evidence which would show that the defendants acted with a discriminatory purpose in enforcing the Commission policies against Quental. The RID code of ethics is a neutral and global policy which prohibits interpreters from "counsel[ing], advis[ing] or interject[ing] personal opinions," whatever their content or basis, when meeting with clients. It does not only prohibit religious expression, but prohibits the interpreter from becoming "personally involved" with the client in any respect whatsoever. Quental has failed to produce any evidence that the defendants have "selected or reaffirmed [its ethics policy] at least in part because of ... its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

Based upon the foregoing, the court concludes that Quental has failed to adduce evidence showing that the defendants selectively treated her in enforcing the Commission's policies or that their enforcement of the policies was motivated by a discriminatory purpose. Accordingly, Quental's equal protection cause of action fails as a matter of law.

### III. *Title VII Cause of Action—42 U.S.C. § 2000e*

The defendants next argue that "while Title VII prohibits religious discrimination in employment, an exception exists when an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." (internal quotation marks omitted). The defendants argue that they did, in fact, reasonably accommodate Quental's religious observance and that they could not have accommodated her practice further without "undermining the purpose, mission and credibility of the Commission, and violating the very Code of Ethics that governs the Commission's execution of that mission."

Quental responds that the defendants "have not shown an undue hardship on

their accommodation of Mrs. Quental's religious beliefs." Quental further argues that the defendants have made no effort to accommodate Quental's religious beliefs.

"Under Title VII, an employer cannot discriminate against any employee on the basis of the employee's religious beliefs unless the employer shows that he cannot reasonably accommodate the employee's religious needs without undue hardship on the conduct of the employer's business." *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir.1985); *see also* 42 U.S.C. § 2000e(j). "To require [the employer] to bear more than a de minimis cost in order to [accommodate an employee] is an undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

■ Here, the defendants reasonably accommodated Quental's religious practices. The letter of reprimand the defendants sent to Quental was limited in its prohibition against Quental's religious expression. Specifically, the letter stated that "while [Quental was] free to hold [her] religious beliefs and live by [her] religious convictions, during the time [she is] being paid by the State of Connecticut to provide interpreting services, [she] should not promote [her] religious beliefs." The letter did not restrict Quental from sharing her religious beliefs or religious tracts with others outside of the context of providing interpreting services to her clients, for example, with her co-workers or non-clients.

Furthermore, the letter stated that "[t]he Commission recognizes the depth and importance of [Quental's] religious beliefs, and is always willing to work with [her] on any scheduling issues that may need to be addressed to accommodate [her] religious activities." While it is reasonable to require the Commission to coordinate Quental's work schedule in order to accommodate her religious practices, it would be an undue hardship for the Commission to allow her to promote her religious beliefs and share religious tracts with her clients. In light of Quental's

position as a state employee interacting with the public, some of whom are mentally ill, there is a risk that these clients may confuse Quental's statements concerning her religious beliefs and her distribution of religious tracts from the First Assembly of God church as the Commission's endorsement of religion and/or the First Assembly of God church. In addition, if the Commission were to allow Quental to share her religious beliefs with her clients, it would be permitting Quental to violate the RID code of ethics, which specifically requires interpreters not to "counsel, advise or interject personal opinions" or "become personally involved" with the client during interpreting sessions.

Based upon the foregoing, the court concludes that the Commission reasonably accommodated Quental's religious practices, and to the extent that it did not, could not do so without undue hardship. Accordingly, Quental's Title VII cause of action fails as a matter of law.

### IV. *Conn.Gen.Stat. § 52–571b*

Quental and the defendants also move for summary judgment as to Quental's state statutory claim pursuant to Connecticut General Statute § 52–571b.

"The district courts may decline to exercise supplemental jurisdiction over a claim . . . if (1) the claim raises a novel or complex issue of State law [or] . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.; see also Miller v. Lovett*, 879 F.2d 1066, 1071–72 (1989) ("[A] court should normally

decline to hear pendent claims if it would ... generate needless decisions of state law").

■ In light of the fact that the court has rendered judgment against Quental on all of her federal claims in this action, the court declines to exercise supplemental jurisdiction over Quental's Connecticut state law cause of action.

## CONCLUSION

For the reasons stated herein, the defendants' motion for summary judgment (document no. 26) is GRANTED and the plaintiff's motion for summary judgment (document no. 29) is DENIED.