275 F.3d 156 (2nd Cir. 2001)
 JO ANN KNIGHT, PLAINTIFF-APPELLANT,
v.
STATE OF CONNECTICUT DEPARTMENT OF PUBLIC HEALTH AND STEPHEN HARRIMAN, COMMISSIONER, DEFENDANTS-APPELLEES.
IN TANDEM WITH
NICOLLE QUENTAL, PLAINTIFF-APPELLANT,
v.
STATE OF CONNECTICUT COMMISSION ON THE DEAF AND HEARING IMPAIRED AND STACEY EUSKO MAWSON, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR, DEFENDANTS-APPELLEES.
 Docket Nos. 00-7289, 00-9131
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: April 10, 2001
December 12, 2001
 
 Jo Ann Knight appeals from an order of the United States District Court for the District of Connecticut (Dominic J. Squatrito, J.) denying her motion for summary judgment and granting defendants' motion for summary judgment.
 Nicolle Quental appeals from an order for the United States District Court District of Connecticut (Alfred V. Covello, J.) denying her motion for summary judgment and granting defendants' motion for summary judgment.
 Affirmed.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 VINCENT P. McCARTHY, American Center for Law and Justice Northeast, Inc. (Ann-Louise Lohr, Patricia Bast Lyman, on the brief) New Milford, CT for Plaintiffs-Appellants.
 
 
 1
 Marianne I. Horn, Assistant Attorney General for the State of Connecticut (Richard Blumenthal, Attorney General; Richard J. Lynch, Assistant Attorney General, on the brief) Hartford, CT for Appellees State of Connecticut Department of Public Health and Stephen A. Harriman, Commissioner.
 
 
 2
 Ralph E. Urban, Assistant Attorney General for the State of Connecticut (Richard Blumenthal, Attorney General, on the brief) Hartford, CT for Appellees State of Connecticut, Commission on the Deaf and Hearing Impaired and Stacey Eusko Mawson, Executive Director.
 
 
 3
 Edward L. White III and Robert J. Muise, Ann Arbor, MI for Knight amicus curiae Thomas More Center for Law & Justice.
 
 
 4
 Edward L. White III, Ann Arbor, MI for Quental amicus curiae Thomas More Center for Law & Justice.
 
 
 5
 Before: Walker, Chief Judge, McLAUGHLIN and Pooler, Circuit Judges
 
 Pooler, Circuit Judge
 
 6
 Jo Ann Knight is a nurse consultant for the Connecticut Department of Public Health. Nicolle Quental is a sign language interpreter for the State of Connecticut Commission on the Deaf and Hearing Impaired. Both women, who describe themselves as born-again Christians, felt called to proselytize while working with clients. Both found themselves reprimanded for their actions. Each brought suit arguing for the right to discuss their religious beliefs with clients while performing their duties. The district courts hearing their cases found the state[1] may reasonably place restrictions on appellants' ability to speak about religion with clients without infringing on appellants' constitutional rights. Knight and Quental seek to have the district court decisions upholding the restrictions on their religious speech reversed. Appellants argue the district courts erred in applying the balancing test set forth in Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, 391 U.S. 563 (1968), to determine when government may restrict its employees' speech. Alternatively, appellants argue their claims are hybrid claims, because two constitutional rights - free speech and free exercise - are implicated, and that hybrid claims are analyzed under a strict scrutiny model rather than under the Pickering balancing test. Appellants also attack the district courts' decisions on their equal protection and Title VII arguments, as well as on a number of minor issues. As Knight and Quental presented similar issues for our review, we chose to hear the cases in tandem and write one opinion. For the reasons given below, we affirm the district courts.
 
 BACKGROUND
 
 7
 The parties in both cases adopt the facts as found by the district courts, with a single exception. Quental objects to the district court's adoption of testimony given by Karen Wilson, a representative of the Mental Health Association of Connecticut, as discussed below. Our recitation thus borrows heavily from the district courts' opinions.
 
 I. Jo Ann Knight
 
 8
 For approximately the last nine years, Knight worked as a nurse consultant for Connecticut's Department of Public Health (the "Department"). Knight v. Conn. Dep't of Health, 97 Civ. 2114, 2000 WL 306447, at *1 (D. Conn. Feb. 22, 2000). Before the events leading up to this lawsuit, her duties included "supervising and surveying the provision of medical services by various Medicare agencies to home health care patients," in part by interviewing patients at their homes. Id. Knight describes herself as a born-again Christian. Id.
 
 
 9
 On October 1, 1996, Knight visited the home of a same-sex couple, one of whom was in the end stages of AIDS. Id. At some point, apparently after finishing the survey, Knight and the two men began discussing religion. Id. Knight said she "experienced a strong sense of compassion for both men and a `leading of the Holy Spirit'" to talk with the men regarding salvation. Id. After asking the men about their religious beliefs, she told them that "good works [are] not unto salvation," and that salvation was "confessing with the mouth that Jesus is the Son of God and believing in one's heart that God raised Him from the dead." Id. Subsquently, after one man stated he did not believe he would be punished for his homosexual lifestyle, Knight told him, "although God created us and loves us, He doesn't like the homosexual lifestyle." Id. After the visit, the men filed complaints against the Department with the Commission on Human Rights and Opportunities alleging discrimination on the basis of sexual orientation in the provision of state services and ultimately filed a lawsuit against Knight, which was later dismissed. Id.
 
 
 10
 On January 3, 1997, Knight received a letter from the Department suspending her for four weeks without pay "for the good of the service and specifically, for misconduct in [her] dealings with a homosexual couple during a home visit." Id. (alteration in the original). Knight and the Department entered into an agreement reducing the suspension to a two-week period without pay and restricting Knight's duties to exclude home visits to patients. The agreement required Knight to create a "Plan of Correction,"[2] to be approved by the program manager, before resuming home visits. Id.
 
 
 11
 Knight brought suit on October 6, 1997. Both sides moved for summary judgment. In granting defendants' motion, the district court found Knight's religious speech to her clients caused them distress and interfered with the performance of her duties, permitting the state to take action. Id. at *3. Further, the district court found Knight did not show she was treated differently than other similarly situated employees, or that the state intentionally discriminated against her. Id. at *4. Finally, the district court found permitting Knight to evangelize to clients would require "the imposition of her ideas on a diverse patient population," such that "accommodating this religious practice would constitute an undue hardship for the defendants." Id. at *5. This appeal followed.
 
 II. Nicolle Quental
 
 12
 Quental works as a sign-language interpreter for one of the defendants, the State of Connecticut Commission on the Deaf and Hearing Impaired (the "Commission"). Quental v. Conn. Comm'n on the Deaf and Hearing Impaired, 122 F. Supp. 2d 133, 136 (D. Conn. 2000). Quental's clients include people with mental health disabilities. Id. Soon after Quental was hired, she took and passed a written examination on the national Registry of Interpreters for the Deaf ("RID") Code of Ethics. Id. The Code of Ethics is a national standard of ethics interpreters follow when providing interpreting services. Id. The Code is incorporated by reference into the collective bargaining agreement ("CBA") governing Quental's employment. Id. The CBA states the Code "shall be honored by both the Commission and its employees." Id. Quental testified that she understood the Code to be part of the terms and conditions of her employment. Id.
 
 In relevant part, the Code states:
 
 13
 Interpreters/transliterators shall not counsel, advise or interject personal opinions... Just as interpreters/transliterators may not omit anything which is said, they also may not add anything to the situation.... [T]he interpreter/transliterator's only function is to facilitate communication. He/she shall not become personally involved.
 
 
 14
 Id.
 
 
 15
 In 1996, Quental was on an interpreting assignment for the Commission at a mental health facility. Id. During a break in the interpreting session, Quental spoke with the client about smoking. Id. She told the client that "the Lord had delivered [her] from smoking." Id. (alteration in the original). She asked the client if she could pray for him so that he might also quit smoking, and then verbally prayed for the client in his presence. Id. The client told Quental's supervisor, defendant Stacie Eusko Mawson, of the incident the next day. Id. Mawson told Quental it was inappropriate to pray for a client in a client's presence, especially clients in mental health facilities. Id. at 136-37. Quental testified that she understood the discussion to mean she should not pray for clients in their presence, especially mentally ill clients, because "you don't know what could set them off." Id. at 137.
 
 
 16
 In October 1997, Quental was on an interpreting assignment at the University of Connecticut Health Center. Id. During the language assessment period - the time when interpreter and client make small talk so the interpreter can assess the client's signing style - Quental shared some of her personal history and religious beliefs with the client. Id. When the client told Quental she had been sexually abused, Quental informed the client that Quental had "a relationship with the Lord" and "God had helped [Quental] in [her] past dealing with [her] past and [that] he could help her also." Id. She also told the client that she "used to smoke and that the Lord [had] delivered [her] from that." Id. (alterations in the original). Quental then gave the client religious tracts entitled "Should I go to church?" "The Key" and "What Does it Mean to Believe." Id. The tracts contained passages from the Bible and were stamped with the name of a church. Quental testified that even after she familiarized herself with the client's signing style, she kept up the conversation about religion because "it was obvious that [the client] was very upset" and Quental was "hopeful that [her conversation] would give her hope." Id.
 
 
 17
 A few days later, Karen Wilson, a representative of the Mental Health Association of Connecticut, Inc., contacted the Commission to complain about Quental's behavior during the University of Connecticut assignment. Id. Quental objects to the admission of Wilson's deposition testimony describing what the client said regarding the interpreting session, arguing the testimony is inadmissible hearsay. For the purposes of our analysis, the relevant testimony is Wilson's description of how the client related what happened, admissible as Wilson's first-hand knowledge of the client's behavior. Wilson testified that the client, a mental health patient, appeared agitated and used "very strong signs, and she was very gestural" in signing to Wilson. Id.
 
 
 18
 The Commission conducted an investigation of Wilson's complaint. As a result of the investigation, the Commission issued a letter of reprimand to Quental on March 5, 1998. The letter stated, in relevant part, that Quental was "free to hold [her] religious beliefs and live by [her] religious convictions, [but that] during the time [she is] being paid by the State of Connecticut to provide interpreting services, [she] should not promote [her] religious beliefs." Id. (alterations in the original).
 
 
 19
 Quental brought suit on January 12, 1999. Both sides moved for summary judgment. In granting defendants' motion, the district court found "1) the Commission's interest in avoiding a disruption of the workplace, maintaining efficiency in the workplace and avoiding a violation of the Establishment Clause outweighs the plaintiff's interest in expressing her religious beliefs to a client while on an interpreting assignment; 2) Quental has failed to adduce evidence showing that the defendants selectively treated her in enforcing the Commission's policies or that their enforcement of the policies was motivated by a discriminatory purpose; and 3) the Commission reasonably accommodated Quental's religious practices, and to the extent that it did not, it could not do so with undue hardship." Id. at 136. This appeal followed.
 
 DISCUSSION
 
 20
 We review grants of summary judgment de novo. Beatie v. City of New York, 123 F.3d 707, 710 (2d Cir. 1997).
 
 I. The Pickering test
 
 21
 Knight and Quental seek the right to discuss and promote their religious beliefs while working with clients receiving government services. Both argue the district courts erred in applying the Pickering balancing test, which determines the right of the government to discipline its employees for their speech. Pickering, 391 U.S. at 567-68.
 
 
 22
 Public employees do not surrender their First Amendment free speech rights by working for the state. Lewis v. Cowen, 165 F.3d 154, 161 (2d Cir. 1999). To determine whether a state violates the First Amendment by disciplining public employees for their speech requires "arriv[ing] at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568; Rankin v. McPherson, 483 U.S. 378, 383-84 (1987). This balancing, commonly called the Pickering test, is required because of "the State's dual role as employer and sovereign." Lewis, 165 F.3d at 161. The state's role as sovereign constrains its ability to regulate speech, while its role as employer provides the "State with greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions." Id. The courts, however, are charged with ensuring "governments do not use their status as employers as a subterfuge to undermine free speech." Id.
 
 
 23
 We first inquire if the speech at issue addressed a matter of public concern. Rankin, 483 U.S. at 384-85; Lewis, 165 F.3d at 161. If the public employee speech does not touch on a matter of public concern, it is not entitled to First Amendment protection; if, however, it does touch upon a matter of public concern, we must balance the interests of the employer in providing " `effective and efficient' public services," against the employee's First Amendment right to free speech. Lewis, 165 F.3d at 162 (quoting Connick v. Myers, 461 U.S. 138, 150 (1983)) see also Rankin, 483 U.S. at 387-88. In so balancing, we "must consider whether the statement sought to be protected `impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' " Lewis, 165 F.3d at 162 (quoting Rankin, 483 U.S. at 388) (modification in the original). Further, "[t]he more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." McEvoy v. Spencer, 124 F.3d 92, 103 (2d Cir. 1997) (citation omitted). Also important is the "manner, time, and place" of the speech. Lewis, 165 F.3d at 162. While the burden of proof lies with the government, "[t]he State need show only a likely interference with its operations, and not an actual disruption." Id. at 163 (internal quotation marks omitted) (emphasis in the original).
 
 
 24
 On appeal, none of the parties argued the issue of whether the speech in question touched on a matter of public concern. The district court in Knight assumed arguendo that the comments touched on a matter of public concern, while the district court in Quental failed to address the point. Knight, 2000 WL 306447, at *3. In the absence of analysis by the parties, and because we find no violation of appellants' First Amendment rights, we assume arguendo that the religious speech at issue touches on a matter of public concern. We turn, then, to the second Pickering prong: balancing the interests of the employer in providing " `effective and efficient' public services" with the employees' right to free speech. Lewis, 165 F.3d at 162 (quoting Connick, 461 U.S. at 150). Here, the state showed permitting religious speech when working with clients was and would continue to be disruptive, and that disruption outweighed appellants' free speech interests. Because appellants' jobs both require a great deal of public contact, the state has a significant interest in regulating speech related to that contact. McEvoy, 124 F.3d at 103. Knight's clients were so upset by her religious speech they brought legal action against the state and Knight personally. Wilson testified Quental's interpreting client was upset and agitated by Quental's religious speech. Prohibiting discrimination against an employee's speech does not require employers to accept speech "that impedes an employee's performance of [her] duties." Hankard v. Town of Avon, 126 F.3d 418, 422 (2d Cir. 1997) (quoting Domiano v. Village of River Grove, 904 F.2d 1142, 1145 (7th Cir. 1990)); see also Rankin, 483 U.S. at 388; Pickering, 391 U.S. at 570-73. Thus, the harmful side effects of the use of religious speech with a client "outweigh its benefits to the speaker-employee," so that "the employer is justified in taking adverse action against the employee in order to mitigate the negative effects." McEvoy, 124 F.3d at 98.
 
 
 25
 In addition, the state raised valid Establishment Clause concerns in limiting the use of religious speech with clients. At a minimum, "[t]he Establishment Clause... prohibits government from appearing to take a position on questions of religious belief...." County of Allegheny v. Am. Civil Liberties Union, 492 U.S. 573, 593-94 (1989). Thus, "the interest of the State in avoiding an Establishment Clause violation may be [a] compelling one justifying an abridgment of free speech otherwise protected by the First Amendment." Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 394 (1993) (alteration in the original) (internal citations and quotations omitted). The Supreme Court recently recognized that the "state interest in avoiding an Establishment Clause violation `may be characterized as compelling,' and therefore may justify content-based discrimination." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 121 S. Ct. 2093, 2103 (2001) (quoting Widmar v. Vincent, 454 U.S. 263, 271 (1981)). In Good News, a Christian club for children challenged Milford's refusal to allow the club use of its facilities after school, based on the club's religious nature. Id. at 2098-2100. The Supreme Court found the school had "no valid Establishment Clause interest," in large part because the school did not sponsor the activity. Id. at 2103. In contrast, Knight and Quental are both government employees who engaged in religious speech while providing state-sponsored services. See, e.g., Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 302-06 (2000) (prohibiting prayer at football games where prayer offered pursuant to school policy and during a school-sponsored event); Lee v. Weisman, 505 U.S. 577, 596-99 (1992) (prohibiting school sponsorship of prayer at graduation ceremonies).
 
 Further, we have held that:
 
 26
 [W]hen government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well be protected by the Free Exercise Clause if the individual were not acting as an agent of government.
 
 
 27
 Marchi v. Bd. of Coop. Educ. Servs. of Albany, 173 F.3d 469, 476 (2d Cir. 1999). Indeed, in permitting the state to provide an interpreter for a deaf student attending a Catholic school, the Supreme Court emphasized the neutrality of the interpreter's speech:
 
 
 28
 Nothing in this record suggests that a sign-language interpreter would do more than accurately interpret whatever material is presented to the class as a whole. In fact, ethical guidelines require interpreters to transmit everything that is said in exactly the same way it was intended...The sign-language interpreter... will neither add to nor subtract from that environment, and hence the provision of such assistance is not barred by the Establishment Clause.
 
 
 29
 Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 13 (1993) (internal quotation marks omitted); see also Agostini v. Felton, 521 U.S. 203, 224 (1997) (explaining that the interpreter in Zobrest did not raise Establishment Clause issues because the interpreter, a government employee, was not "inculcating any religious messages"). Here, both Knight and Quental promoted religious messages while working with clients on state business, raising a legitimate Establishment Clause concern. This permits the state to place a slight burden on appellants' speech: Knight and Quental may not share their religious beliefs with clients while conducting state business.
 
 II. Equal protection
 
 30
 Both Knight and Quental argue their right to equal protection under the Fourteenth Amendment was violated by appellants because they were disciplined for their religious speech and other, similarly situated employees were not disciplined for their speech. To show an equal protection violation, appellants must show they were selectively treated compared with other similarly situated employees, and that selective treatment "was based on impermissible considerations such as race, [or] religion...." Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000) (internal quotation marks omitted). Appellants must also prove "that the decisionmakers in [their] case[s] acted with discriminatory purpose." McCleskey v. Kemp, 481 U.S. 279, 292 (1987). Neither appellant provided any evidence to show they were treated differently than other similarly situated employees, or that any decisionmaker acted with a discriminatory purpose. Nor is there any evidence to refute the state's contention that the same prohibition applies to speech on any potentially inflammatory topics, such as sex or politics, making the prohibition content-neutral. Therefore, the district courts properly dismissed appellants' equal protection claims.
 
 III. Hybrid claims
 
 31
 In the alternative, appellants argue theirs are hybrid claims, implicating both free speech and free exercise rights, and requiring a strict scrutiny analysis rather than analysis under Pickering. Both rely on Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 890 (1990), where the Supreme Court held the Free Exercise Clause did not prohibit that state from applying its anti-drug laws to prohibit the use of drugs in religious ceremonies. Smith argued his right to free exercise of religion permitted him the ceremonial use of peyote in Native American Church ceremonies, even though Oregon law prohibited peyote. Id. at 874, 110 S. Ct. 1595. In reaching its holding, the Supreme Court noted:
 
 
 32
 The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, see Cantwell v. Connecticut, 310 U.S. [296] at 304-307 [1940], (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed non-religious); Murdock v. Pennsylvania, 319 U.S. 105 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); Follett v. McCormick, 321 U.S. 573 (1944) (same), or the right of parents, acknowledged in Pierce v. Society of Sisters, 268 U.S. 510 (1925), to direct the education of their children, see Wisconsin v. Yoder, 406 U.S. 205 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school).
 
 
 33
 Smith, 494 U.S. at 881. Appellants' reliance on Smith is misplaced, as the language relating to hybrid claims is dicta and not binding on this court. Donovan v. Red Star Marine Servs., Inc., 739 F.2d 774, 782 (2d Cir. 1984). However, based on this language from Smith, some courts have acknowledged the possibility of hybrid rights claims. See, e.g., Swanson By and Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 699-700 (10th Cir. 1998); Brown v. Hot, Sexy and Safer Prods., 68 F.3d 625, 539 (1st Cir. 1995). Other courts have rejected hybrid rights analysis outright. See, e.g., Kissinger v. Bd. of Trustees of Ohio State Univ., 5 F.3d 177, 180 (6th Cir. 1993) ("[A]t least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard... to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause.").
 
 
 34
 In this Circuit, we have not yet addressed generally whether hybrid claims require a greater governmental justification than each component of the hybrid claim taken separately and we need not do so here because appellants' comments are limited to the public employee context. As discussed above, it is well settled that appellants' right to free speech as public employees is entitled to some First Amendment protection. However, due to the state's significant interest in regulating the expressive conduct of its employees while they are acting on behalf of the state, appellants' free speech claims are subject to the Pickering balancing test. Pickering, 391 U.S. at 568. The allegation that a state action that regulates public conduct infringes more than one of a public employee's constitutional rights does not warrant more heightened scrutiny than each claim would warrant when viewed separately. In both situations, the employer's interest remains the same and is entitled to the same weight in the constitutional balance.
 
 IV. Title VII
 
 35
 Knight and Quental next argue the state must allow them to use religious speech in their dealings with clients as a reasonable accommodation under Title VII. Title VII makes it illegal for employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's... religion." 42 U.S.C. 2000e-2(a)(1). Employers are required to reasonably accommodate an employee's religion unless doing so would constitute an undue hardship. 42 U.S.C. § 2000(e)(j); Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir. 1985).
 
 
 36
 To make out a prima facie case of religious discrimination, Knight and Quental must show (1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement. Philbrook, 757 F.2d at 481. If the employees establish a prima facie case, the burden then shifts to the employer to show it could not accommodate the employees' religious beliefs without undue hardship. Id. Here, plaintiffs failed to make out their prima facie cases. Neither appellant can show the state was on notice of their need to evangelize to clients. Clearly, both plaintiffs hold bona fide religious beliefs, and their employers knew both were born-again Christians, but there is no evidence in the record showing appellants requested any sort of accommodation for their need to evangelize. beliefs. Knowledge that Knight and Quental are born-again Christians is insufficient to put their employers on notice of their need to evangelize to clients. To hold otherwise would place a heavy burden on employers, making them responsible for being aware of every aspect of every employees' religion which could require an accommodation. See, e.g., Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1020 (4th Cir. 1996) ("Knowledge that an employee has strong religious beliefs does not place an employer on notice that she might engage in any religious activity....").
 
 
 37
 Moreover, even assuming appellants did make out their prima facie cases, the accommodation they now seek is not reasonable. Permitting appellants to evangelize while providing services to clients would jeopardize the state's ability to provide services in a religion-neutral matter. See Chalmers, 101 F.3d at 1021 (not reasonable to require employer to accommodate employee's need to write letters to co-workers criticizing their private lives and urging religious solutions); Wilson v. U.S. W. Communications, 58 F.3d 1337, 1341-42 (8th Cir. 1995) (requiring employee to cover anti-abortion button depicting a color photograph of a fetus while at work represented a reasonable accommodation). Further, the state reasonably accommodated plaintiffs' beliefs. The restrictions on their religious speech applied only while working with clients on state business. The state permitted Knight to lead prayer at a staff meeting, and there is no evidence her religious activities were curtailed other than when visiting clients. Similarly, the letter of reprimand to Quental makes clear the restrictions apply only to interpreting assignments, and offered to work with Quental regarding accommodations for her religious beliefs. Thus, the district courts correctly concluded appellants' Title VII rights were not violated.
 
 V. Other issues
 
 38
 Knight and Quental also appeal from the district courts' adverse rulings on a number of smaller issues unique to each appellant. For substantially the reasons given in the district court decisions, we find those issues were correctly decided and need not address them here.
 
 CONCLUSION
 
 39
 For the reasons given above, we affirm.
 
 
 
 NOTES:
 
 
 [1]
 For ease of reading, we refer to appellees in both cases as the state.
 
 
 [2]
 The district court mistakenly referred to this as a "Plan or Correction." Knight, 2000 WL 306447, at *2.